# IN THE COURT OF APPEALS OF IOWA

No. 14-1722
Filed January 28, 2015

**IN THE INTEREST OF M.W.,**
**Minor Child,**

**J.C., Father,**
Appellant.

_____

Appeal from the Iowa District Court for Warren County, Kevin Parker, District Associate Judge.

A father appeals from a juvenile court order terminating his parental rights. **AFFIRMED.**

Adam Kehrwald of Kehrwald Law Firm, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Kathryn K. Lang and Kathrine S. Miller-Todd, Assistant Attorneys General, John Criswell, County Attorney, and Tracie Sehnert, Assistant County Attorney, for appellee.

Nancy Trotter, Des Moines, for mother.

M. Kathryn Miller, Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor child.

Considered by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, J.**

The father appeals from termination of his parental rights to M.W.[1]  He contends the evidence was not clear and convincing that M.W. could not be placed in his custody at the time of the termination.  Because we find the evidence was clear and convincing, we affirm.

## I.    BACKGROUND FACTS & PROCEEDINGS.

M.W. (born January 2013) came to the attention of the Department of Human Services (DHS) in May 2013 because of the mother's hospitalization following self-harming behaviors.  At the time, M.W. was in the mother's care, and paternity of M.W. was unknown.  The juvenile court removed M.W. from the mother because her mental health issues rendered her unable to care for an infant.  It adjudicated M.W. a child in need of assistance (CINA) under Iowa Code sections 232.2(6)(b), (c)(2), and (n) (2013).  The court placed M.W. with the maternal grandmother where she has resided throughout this case.

Shortly after the removal, the district court ordered a paternity test.  In July, the paternity test confirmed the appellant is M.W.'s biological father.  Prior to the paternity test, the father had no contact with M.W.  They met for the first time in September 2013, after the opening of the CINA case in May 2013.

In the January 2014 disposition review order, the juvenile court denied the father's request that custody of M.W. be transferred to him.  The court found the father had a history of mental health issues and was then under treatment.  It further found his living arrangement was unsuitable for the child, and his

---

[1] The juvenile court also terminated the rights of the mother.  She does not appeal.

parenting skills were "a work in progress, at best." The court concluded, "[P]lacement in or a return to the home would be contrary to the child's welfare due to ongoing parenting and mental health issues of both parents and a lack of a stable and suitable home environment of the father for the child." The court adopted the family safety case plan and ordered the father to comply with its requirements.

At the time the father's paternity was confirmed, he was participating in mental health therapy and psychiatric care. He was diagnosed with bi-polar, attention deficit, and borderline personality disorders. He completed parenting classes for infants and one-to-three-year olds. He also began participating in "dyadic therapy," a family interaction therapy, together with M.W. He was allowed to pick up M.W. from daycare for the purpose of taking her to dyadic therapy. The father has a criminal history including three convictions for operating-while-intoxicated and one for harassment, as a result of which there is a no-contact order between him and the mother. He reported that his mental health was stable, he had been on his medications for two or three years, and he had stopped drinking. DHS established two one-hour visitations and one four-hour visitation per week. Visitation was supervised and took place in the father's apartment, but M.W. was not permitted to enter the father's room, which was so cluttered and dirty, DHS considered it a fire hazard.

During visitations and interactions with the father, the family safety, risk, and permanency (FSRP) and DHS workers grew concerned about his ability to parent M.W. independently due to his failure to follow parenting

recommendations and to comply with their requirements for his conduct. The workers reported the father was resistant to or argumentative over the suggestions and recommendations they made, despite repeated prompts and reminders. The father did not feed M.W. according to the schedule the maternal grandmother established; he fed M.W. formula rather than whole milk as M.W.'s pediatrician recommended; he did not give M.W. baths when the FSRP worker instructed him to do so. During some visitations, the paternal grandmother provided supervision; the FSRP worker reported the paternal grandmother prompted the father to make all the necessary parenting decisions like feeding and diaper-changing.

The father also made statements that made the FSRP and DHS workers concerned about his parenting knowledge and ability. His decision to feed M.W. formula rather than whole milk was because he believed whole milk was bad for her before bedtime. He declined to use extra-absorbent diapers, stating he believed they were for lazy parents. He stated that when M.W. had socks on, it made her head warm.

DHS reported the father appeared to be irrationally paranoid about M.W.'s health and her placement with the maternal grandmother. He stated he felt M.W. was not safe with the maternal grandmother, although no one else had any such concern. He stated that he did not have faith in M.W.'s pediatrician, and that the DHS and FSRP workers did not communicate with him about M.W.'s medical

condition.[2] DHS informed the father he could and should attend M.W.'s doctor's appointments, but he never did so. The DHS worker also testified that, as M.W.'s father, he did not need special permission to obtain copies of her medical records, and the father admitted he later did obtain the records. The DHS worker testified the father took M.W. to a different doctor to get a "second opinion," without informing DHS or the maternal grandmother. At this appointment, the doctor prescribed M.W. an antibiotic. The father filled that prescription and gave it to the daycare workers when he dropped her off there afterward. When questioned on the possible danger inherent in obtaining medication for M.W. without informing the maternal grandmother or DHS, the father responded that he filled the prescription at the same pharmacy as M.W.'s other prescriptions, and the pharmacist would have notified him if there was a problem with dispensing different medications. On another occasion, the father took M.W. to the emergency room without obtaining permission to do so because he observed her rubbing her ears. The doctor found no medical problem with her ears.

In June 2014, the guardian ad litem filed a petition for termination of both the mother's and father's parental rights. The court held hearings on the petition in August. Prior to the hearing, the FSRP worker reported the father "appear[ed] overprotective to the point where his statements [did not] even make sense." She was concerned that the father did not cooperate with services providers on parenting issues or follow necessary parenting prompts or advice from M.W.'s doctor. The FSRP worker felt the father would be unable to care for M.W. on his

---

[2] M.W. was treated for ear infections and acid reflux. Both conditions improved as she got older.

own. DHS also was concerned that the father had taken M.W. to various places unsupervised and without authorization when he only had permission to pick her up from daycare and take her to dyadic therapy. In addition to taking her to a different doctor and to the emergency room, the father had taken her to lunch and did not return her to daycare as scheduled. When questioned, he asserted this was a result of miscommunication. At other times, he stated he was acting in M.W.'s best interest.

> The DHS worker reported:

> [The father] has not been able to show that he can safely parent [M.W.] at this time. He has never had unsupervised visitation with [M.W.] due to concerns that he cannot meet her physical and emotional needs. He continues to work at those areas to improve but [M.W.] cannot wait for [the father] to improve his parenting skills. [M.W.] deserves a permanent home where she can attach to the caregiver and not be in danger. Additionally, this worker believes that [the father] exhibits signs of uncontrolled mental illness. He has a temper and argues with authority about many things and often has unorganized and paranoid thinking patterns. This worker recommends a termination of parental rights due to the child's age and [the father's] mental health and parenting issues.

At the time of the termination hearing, the father was employed part-time with a temping agency. He continued to attend mental health therapy and dyadic therapy with M.W. He continued to live with his mother and had not cleaned his room to the point that DHS would allow M.W. to enter it. The juvenile court terminated the father's parental rights under Iowa Code section 232.116(1)(h). The father appeals.

## II. STANDARD OF REVIEW.

We review a juvenile court order terminating parental rights de novo. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). We give weight to the factual

determinations of the juvenile court, especially with regard to witness credibility, but are not bound by them. *Id.* Our primary consideration is the best interest of the child. *Id.* at 776.

## III. ANALYSIS.

We will uphold termination of parental rights where there is clear and convincing evidence of the statutory grounds for termination. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Evidence is clear and convincing when there are no serious or substantial doubts as to the correctness of conclusions of law drawn from the evidence. *Id.*

To terminate parental rights under Iowa Code section 232.116(1)(h), the State must show by clear and convincing evidence the child is three years old or younger, has been adjudicated a child in need of assistance, has been removed from the parent's care for at least the last six consecutive months, and cannot be returned to the parent's custody at the time of the termination hearing. The father's sole contention is that the evidence was not clear and convincing that M.W. could not be placed in his custody.

In terminating the father's parental rights, the court made the following findings:

> Father has some delusional ideas as to child care and, in particular, medical care for the couple's young child. The father has failed to recognize the medical dangers to his daughter by his course of conduct in "doctor shopping." Father has taken [M.W.] to the emergency room for no apparent medical issue present in the child. His mental health disorders cloud his judgment (bi-polar and borderline personality)[.]
> Father has not had unsupervised visits. He has parenting problems, and his mental health issues create an unsafe environment for the child. Father has a difficult time in cooperating

with the day-care provider, the FSRP worker and [the maternal grandmother]. His access to services has not improved his ability to parent a young child. His inflexibility makes it difficult for him to parent [M.W.] successfully. He relies upon others in order to provide the majority of care for his daughter. Father believes the FSRP worker is unethical due to the relationship of the parties. His paranoia makes it difficult for him to cooperate with the service providers. He has failed to attend medical appointments with the parties and does not trust the medical providers involved with his daughter. Father indicates that he will cooperate with the service providers if his daughter is placed in his custody. He has failed to cooperate with the providers during the pendency of this matter and the Court does not believe the father will cooperate if custody is placed with him.

We note that the initial removal was from the mother, and the father did not become involved until later in the CINA case. The adjudication of M.W. under Iowa Code sections 232.2(6)(b), (c)(2), and (n) reflected the mother's parenting issues, not the father's. Iowa Code section 232.116(1)(h) requires the State to prove "the child cannot be returned to the custody of the child's parents as provided in section 232.102." We must determine by clear and convincing evidence that the child would suffer harm if returned to the parent's care. *In re J.R.*, 478 N.W.2d 409, 412 (Iowa Ct. App. 1991). "[W]e consider what the future likely holds for the child[] if [she is] returned." *Id.* "Insight for that determination may be gained from evidence of a parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing." *Id.*

The father insists he has cooperated with DHS and participated in services to improve his parenting, "to the best of his ability." Nonetheless, we find the evidence is clear and convincing that M.W. cannot be placed in the father's custody. The father was aware of M.W.'s feeding schedule and declined

to follow it. He also was aware M.W.'s pediatrician recommended she get whole milk rather than formula. Despite repeated reminders, it took the father a significant amount of time before he was willing to comply with these directives. He remained irrationally opposed to the pediatrician's treatment of M.W. but did not take the opportunities to attend her appointments. His response instead was to take her to a second doctor without authorization to do so. When questioned about the dangers of possible drug interactions from the medications prescribed, he responded the pharmacist would have informed him of any problems. He did not make the maternal grandmother, DHS, or the daycare aware of his actions. He took advantage of the permission he had to take M.W. to dyadic therapy to take her to the doctor, the emergency room, and out to lunch without notification, authorization, or supervision.

The State points out a number of the father's more unusual statements about parenting to impugn his ability to care for M.W. Most parents harbor some beliefs, myths, or superstitions of varying degrees of accuracy regarding their children or child-rearing in general. Thus, the father's theories about hats, socks, and extra-absorbent diapers do not impress us with doubts about his ability to parent M.W. safely. What does concern us is the father's unwillingness to take direction about M.W.'s care from anyone, including M.W.'s pediatrician, and his inability to cooperate with services to ensure M.W.'s safety. Also of concern is the father's living situation. He shares a two-bedroom apartment with his mother; there is no room for M.W.; and his own room is too unsanitary and dangerous for M.W. to enter. On this record, it is clear that the juvenile court could not place

M.W. in his custody without risking her suffering harm from the father's parenting shortcomings or the living conditions in his home. Accordingly, we affirm termination of his parental rights under Iowa Code section 232.116(1)(h).

## IV.    CONCLUSION.

Because we find the evidence is clear and convincing that M.W. cannot be placed in the father's custody, we affirm termination of his parental rights.

**AFFIRMED.**